**Donald Yannella, P.C.**
Attorney at Law
7 Dey Street, Suite 803
New York, NY  10007
------------------------------
(212) 226-2883
fax:  (212) 226-2861

Admitted in NY & NJ

October 13, 2007

Hon. Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, NY  10007

    Re:    US v. Juan Rivera
            07 Cr 430 (JSR)

Dear Judge Rakoff:

      I am counsel for Juan Rivera, who is scheduled to be sentenced on October 16, 2007.

      Mr. Rivera pleaded guilty to count one of the indictment:  conspiracy to commit a Hobbs Act Robbery, 18 USC § 1951 (b) (1).   This offense carries no statutory minimum term of imprisonment and a maximum of twenty years.  The statutory maximum fine is $250,000 or twice the pecuniary gain or loss.  The statutory maximum term of supervised release is 3 years.

      The parties entered into a Plea Agreement that stipulates, as a result of Career Offender Guideline enhancements, that Mr. Rivera's offense level is 29 and his Criminal History Category is VI.  This yields an advisory Guidelines range of 151 to 188 months.  Under the Plea Agreement, the parties agree not to seek departures but may seek a sentence outside the stipulated range.

      Mr. Rivera respectfully requests that the Court impose a term of 87 months' imprisonment, which is below the stipulated advisory Guidelines range, and three years' supervised release.

## I. THE OFFENSE CONDUCT

This case involved a confidential informant contacting Mr. Rivera's brother, Luis Fuentes, regarding commission of a robbery of a drug dealer.  At the direction of law enforcement officials, the confidential informant contacted Mr. Fuentes on March 6, 2007 and set up a meeting for the next day.

On March 7, 2007, Mr. Fuentes and Mr. Rivera met with the confidential informant at the Seafood Factory, a restaurant in the Bronx.  During this meeting, Mr. Rivera did very little talking.  The confidential informant told them that a drug trafficker from Miami was coming up to New York City the following week with approximately 7 to 10 kilograms of cocaine.

On March 13, 2007, the confidential informant again met with Mr. Fuentes and Mr. Rivera and discussed plans for a robbery.

On March 14, 2007, the confidential informant told Mr. Fuentes that the man from Miami was arriving.  Mr. Rivera was wary of having any involvement with the confidential informant or the robbery, but he participated with the understanding that his role would be as a look out.

At approximately 2:00 p.m. on March 14, 2007, law enforcement officers conducted surveillance of the confidential informant meeting with Mr. Fuentes, Mr. Rivera, and Jose Negron, at the Seafood Factory.  Law enforcement officers arranged for the confidential informant to have the men follow his car to a BP gas station, supposedly to wait for the drug trafficker.  Law enforcement officers moved in and removed Mr. Negron, Mr. Fuentes and Mr. Rivera from the car and arrested them.  A loaded firearm and a BB gun were seized from the car and vouchered as evidence.

## 2. THE PLEA AGREEMENT

The parties entered into a Plea Agreement, dated June 26, 2007.  It contains the following stipulations, which bind the parties but not the Court:

    Base offense level, § 2B3.1(a):    20

    Because the taking of a controlled substance was planned,
    increase by one pursuant to § 2B3.1 (b) (6)    +1

| | |
|---|---:|
| Because a firearm was possessed, increase by 5 pursuant to § 2B3.1 (b) (2) (C) | +5 |

This results in an offense level of 26.

The plea agreement says that Mr. Rivera is a career offender because:

    (1) he was at least 18 at the time of the offense,

    (2) the offense is a crime of violence as defined in § 4B1.2 (a); and

    (3) he has two prior convictions for a controlled substance offense, as described in § 4B1.2 (b) and (c).

| | |
|---|---:|
| Under the Career Offender Guideline, §4B1.1 (b) (C), because the maximum term of imprisonment is 20 years for the Hobbs Act robbery, the base offense level is increased to 32. | **32** |
| For acceptance of responsibility, reduce by three points, pursuant to § 3E1.1 (a) and (b) | **-3** |
| Total Offense Level | **29** |

In sum, as a result of Career Offender enhancements, the offense level is 29 and the Criminal History Category is VI.

The parties stipulate that the Guidelines range is 151 to 188 months.

The parties stipulate that neither side will ask for a Guidelines departure, but that either side can ask for a sentence outside the stipulated range.

### 3. PRESENTENCE REPORT

The PSR uses the November 1, 2006 edition of the Guidelines Manual, and its calculations are identical to those in the Plea Agreement.

The Presentence Report concludes that Mr. Rivera has 6 criminal history points, which would place him in Criminal History Category III. However, because he is a Career Offender, the CHC is enhanced to VI, pursuant to §4B1.1. He is a Career Offender due to his two prior felony convictions involving attempted criminal sale of a controlled substance

in the 3rd degree.

Mr. Rivera has been given a copy of the Presentence Report and has reviewed it with counsel. He has no objections.

## 4. PERSONAL HISTORY OF JUAN RIVERA

Juan Rivera is 33 years old and was born in the Bronx. His father was employed as a factory worker, and his mother was a dental assistant. His father moved out of the home when Juan was 12 years old and lost contact with the family altogether when Juan was 17. Juan has had no contact with his father in approximately 20 years.

Juan's mother, Martha Morales, is on public assistance and lives in the Bronx. She has legal custody of Juan's 12 year old son, Justin Rivera. Luis Fuentes, the co-defendant in the indictment, is Mr. Rivera's maternal half-brother.

Attending Alfred E. Smith High School in the Bronx, Juan dropped out after the tenth grade to earn money. He was employed as a vendor at Yankee Stadium from April 1993 until September 1994. Unfortunately, for a large part of his adult life he has been incarcerated.

His first felony conviction arose from his attempt to sell 5 glassines of heroin to an undercover officer in 1994, when he was 20 years old. His second felony conviction was from acting in concert with another person who attempted to sell 2 glassines of heroin in 1997, when Mr. Rivera was approximately 23 years old. Although Mr. Rivera originally was placed on probation for the first felony, he violated the probation and was sentenced to a term of 2 to 6 years. For the second conviction, he was sentenced to a term of 3 1/2 to 7 years. Altogether, Mr. Rivera was in prison most of the ten years between his first felony arrest in 1994 and his release from state prison on July 26, 2004, except that he was "out" between 1997 and 2000.

Upon his release in 2004, Mr. Rivera was employed as a tile and carpet installer at Real Floors, on Long Island. He earned $10.00 per hour.

Mr. Rivera has five children: Iveliz Rivera (age 15, living in Puerto Rico), Justin Rivera (age 12, living in the Bronx), Destiny Rivera (age 9, living in Queens), Jaylin Rivera (9 months old), and J. Sean Rivera, (10 months old, living in the Bronx).

Two of the children are from his ten-year relationship with Sehada (Sandy) Hadzovic. She is employed as a vault supervisor in the diamond district, and she resides in Queens.

4

Prior to his incarceration, Mr. Rivera had frequent contact with his children and provided for them financially. He could not keep up with the childcare payments and, instead, paid money directly to the children's caretakers. Since his incarceration he has had visits with three of his children: Destiny, Jaylin, and Justin.

Attached as Exhibit A are letters from Mr. Rivera's immediate family: his mother, Marcia Morales; his son, Justin Rivera; his daughter, Destiny Rivera; the mother of two of his children, Sehada Hadzovic; and his brother, Erik Rivera. All say that, although Mr. Rivera has made certain mistakes, he is a good father, brother, and son.

Attached as Exhibit B are letters from friends: Siomara and Noel Ortiz; Tammy and Ray Perez, and Carolina Echeverria.

Between the time of his release from state prison in 2004 and his federal arrest in 2007, Mr. Rivera resided primarily with his mother and son in the Bronx. His mother has asthma, arthritis, and has sustained two heart attacks, most recently on April 18, 2007. She has an inoperable vein and takes medication.

Attached as Exhibit C is a letter from his mother's physicians, reporting that she suffers from coronary heart disease and that she is unable to ambulate great distances. Mr. Rivera's mother has legal custody of Justin Rivera, who is a seventh grader.

## 5. DRUG USE AND DRUG TREATMENT PROGRAM

Mr. Rivera inhaled heroin on a daily basis from the ages of 20 until 29. He started smoking marijuana before he was a teenager.

Attached as Exhibit D are records from Bronx Lebanon Hospital Center where Mr. Rivera received counseling and methadone maintenance from 2004 until his federal arrest on March 14, 2007. According to the records, Mr. Rivera applied for the program on October 20, 2004, approximately 3 months after his release from state prison. It is to Mr. Rivera's credit that, as stated in his application, he was not on parole or under any court mandate when he entered the program. He did so of his own volition because he recognized the danger of using illegal drugs.

In his early counseling sessions, he reported that he had first used heroin at the age of 17. By November 2004, he reported that he was suffering from insomnia, joint and body pain, and shakes during the morning hours due to heroin withdrawal. He also reported that he was beginning a job search (which would lead to his job as a carpet installer). By May of 2005, Mr. Rivera had completed the Keep Program phase of treatment. In July 2005, Mr. Rivera's continued to attend the program but his status was in jeopardy to problems with Medicaid. In August 2005, Mr. Rivera relapsed briefly, self-

5

reporting that he had used 3 bags of heroin when he was out of town and could not get his methadone. However, he continued in the program throughout 2005, and by November he was permitted to take methadone with him when he was required to leave New York at 6 AM to report to work in New Jersey, indicating that the program had a level of trust in him. In January 2006, he again was allowed to take methadone when he left New York City to visit a brother in jail. He again had a brief relapse in the summer of 2006, but by October 2006 the records indicate that he had 3 months of clean urine. However, from the fall of 2006 until his arrest on March 14, 2007, the records indicate that he used marijuana, even though he continued to attend the program. Some of the last records from the program indicate that, in February 2007, Mr. Rivera was again in danger of being terminated from the program because of trouble with Medicaid. He was discharged from the program on April 2, 2007 after failing to report for 2 weeks while he was incarcerated.

When interviewed by Pretrial in the Southern District on March 14, 2007, Mr. Rivera had marijuana and opiates in his system. He was receiving 170 milligrams of methadone daily at Bronx Lebanon, and the treatment was continued when he first entered the Metropolitan Correction Center.

## 6. SENTENCING FACTORS PURSUANT TO 18 USC § 3553

In *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), the remedial majority held that district courts must consider the guidelines range, 18 U.S.C. § 3553 (a)(4) and (5), but must also consider the other factors set forth in § 3553 (a). Under *Booker*, courts must treat the guidelines as just one of a number of sentencing factors.

Section 3553(a) of Title 18 requires a district court to "impose a sentence, sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" and to "consider" the following factors "in determining the particular sentence to be imposed":

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

6

### § 3553 (a) (1):  "the nature and circumstances of the offense" and "the history and characteristics of the defendant"

Although the offense is of a serious nature, it should be noted that this was a sting operation and the purported "victim" did not exist.  Law enforcement officials fabricated the story of a "drug trafficker from Miami" for the confidential informant to tell to Mr. Fuentes.

Also, the arrests were made before there was an opportunity to attempt to commit a robbery.  The three defendants were arrested in their vehicle when they were following the confidential informant to the anticipated crime scene.

Mr. Rivera has no history of violence.  He has never before been arrested for assault, weapons possession, or any other offense of a violent nature.  In the instant case, nobody sustained any injuries, and the firearm and BB gun were not discharged.

It also must be noted that this case did not involve a long-term investigation of Juan Rivera.  There is no evidence or suggestion that he committed other Hobbs Act robberies.  Instead, the confidential informant targeted one of the co-defendants.

### § 3553 (a) (2) (A), (B) and (C):  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant

This was a serious offense because a loaded firearm and BB gun were recovered from the vehicle when law enforcement officers made the arrests.  Although the man from Miami did not exist, commission of an armed robbery in Manhattan is a danger to the community.

However, a sentence within the stipulated Guidelines range would be excessive.  That range, 151 to 188 months, would be inconsistent with the mandate of Section 3553(a) of Title 18, which requires a district court to "impose a sentence, sufficient, but not greater than necessary\*\*\*" to satisfy the other factors enumerated in § 3553.  The minimum term in the stipulated range, 151 months, is more than 12 1/2 years.  The maximum term of 188 months is more than 15 1/2 years.  A sentence within that range would be inappropriate.

Although Mr. Rivera is a Career Offender, his prior felonies involved attempted sales, respectively, of 5 and 2 glassines of heroin.  In the second case, he was not even the principal actor.  Therefore, although he is a Career Offender, the nature of his prior felonies

may be viewed as a mitigating factor.  It should also be noted that, when he committed those prior felonies, he was addicted to heroin and trying to support his habit.

A sentence well below the stipulated Guidelines range would suffice to deter criminal conduct by others, to promote respect for the law, and to provide just punishment for the offense.

**§ 3553 (a) (2) (D):  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**.

Mr. Rivera would benefit from getting his GED while in federal custody.

Although he previously has been employed as a carpet and tile installer, it would be helpful to Mr. Rivera to obtain additional job skills in anticipation of his eventual release.

Finally, Mr. Rivera would benefit from receiving drug treatment while in the Bureau of Prisons.  He would like to participate in the RDAP 500 hour program, but he fears that it would cause him to be transferred to a facility far from home, where his family would be unable to visit.

## 7.  CONCLUSION

Conspiracy to commit a Hobbs Act Robbery, 18 USC § 1951 (b) (1), carries no statutory minimum term of imprisonment and a maximum of twenty years.  The maximum fine is $250,000 or twice the pecuniary gain or loss, and the maximum term of supervised release is 3 years.

The Plea Agreement stipulates that, as a Career Offender, Mr. Rivera's offense level is 29 and his Criminal History Category is VI.  This yields an advisory Guidelines range of 151 to 188 months.  The Plea Agreement permits the parties to seek a sentence outside the stipulated range.

If Mr. Rivera were not a Career Offender, the Guidelines, as calculated in the PSR, would call for a sentence of 57 to 71 months.  Mr. Rivera respectfully submits that a sentence above that range, such as a term of 87 months, would be appropriate.  That would be a sentence in excess of 7 years.

The co-defendant, Luis Fuentes, has not yet been sentenced.  The charges against Mr. Negron were dismissed.

The Probation Department concludes that Mr. Rivera is indigent and cannot afford to pay a fine. Mr. Rivera requests that no fine be imposed.

Mr. Rivera requests a recommendation that he be designated to a facility close to New York City, such as Fort Dix or Otisville, in order to permit his family to visit. His absence has been especially difficult for his mother and children, and they hope to maintain contact with him while he serves his term of imprisonment.

Sincerely,

/s/ *Donald Yannella*

Donald J. Yannella, Esq.

CERTIFICATE OF SERVICE

    I affirm that today I served a copy of the attached document upon the following individual:

    A.U.S.A. Lauren Ouziel
    One St. Andrew's Plaza
    New York, NY  10007
    Via e-mail

Dated:  October 13, 2007

                                                  /s/ Donald Yannella
                                                  _____
                                                  Donald Yannella, Esq. (DJY-7350)